

*1038943302*

CJ17 7045 —
Andrews

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

BIDARKA GAS CORP., an Oklahoma
corporation, DUSLEI ENERGY, LLC, an
Oklahoma limited liability company, JIM
PRICE OIL CO. LLC, an Oklahoma limited
liability company, CCJ VENTURES LLC, an
Oklahoma limited liability company,
BECKHAM OIL CO. LLC, an Oklahoma
limited liability company, BIG J'S OIL CO.
LLC, an Oklahoma limited liability company,
GARBET INVESTMENTS LLC, an
Oklahoma limited liability company,
DEBORAH K. BRANDT, an individual,
CHARLES R. DOZIER, an individual and
MARGARET DOZIER, an individual,

                                    Plaintiffs,

v.

STEPHEN J. MERRILL, individually and as
trustee of the MFS TRUST DATED
SEPTEMBER 30, 1997, KAREN MERRILL,
individually and as trustee of the MFS TRUST
DATED SEPTEMBER 30, 1997, SBM
ENERGY, LLC, an Oklahoma limited liability
company, MFS TRUST DATED
SEPTEMBER 30, 1997,

                                    Defendants.

CJ-2017-7045

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

DEC 1 5 2017

RICK WARREN
COURT CLERK
40

Case No. CJ-2017-

## PETITION

COMES NOW, Bidarka Gas Corp., an Oklahoma corporation, Duslei Energy, LLC, an

Oklahoma limited liability company, Jim Price Oil Co. LLC, an Oklahoma limited liability

company, CCJ Ventures LLC, an Oklahoma limited liability company, Beckham Oil Co. LLC,

an Oklahoma limited liability company, Big J's Oil Co. LLC, an Oklahoma limited liability

company, Garbet Investments LLC, an Oklahoma limited liability company, Deborah K. Brandt,

EXHIBIT
A

an individual, Charles R. Dozier, an individual and Margaret Dozier, an individual (collectively referred to as "Plaintiffs") and state as follows:

1.      Bidarka Gas Corp., an Oklahoma corporation, Duslei Energy, LLC, an Oklahoma limited liability company, Jim Price Oil Co. LLC, an Oklahoma limited liability company, CCJ Ventures LLC, an Oklahoma limited liability company, Beckham Oil Co. LLC, an Oklahoma limited liability company, Big J's Oil Co. LLC, an Oklahoma limited liability company, and Garbet Investments LLC, an Oklahoma limited liability company, are all entities organized and validly existing under the laws of the State of Oklahoma and have their principal place of business in Oklahoma.

2.      Deborah K. Brandt, an individual, Charles R. Dozier, an individual and Margaret Dozier, an individual all reside in the state of Oklahoma. All Plaintiffs and Buford and Helen Williams are referred to as "Investors."

3.      On or about March 25, 2015, Stephen J. Merrill as trustee of the MFS Trust dated September 30, 1997 (the "MFS Trust"), entered into an Exclusive Option agreement (the "Exclusive Option") with Tyson Oil Company, LLC, an Oklahoma limited liability company, Gary Mack Tyson a/k/a Gary Tyson, Carolyn Tyson, Pamela Sue Rhodes a/k/a Pam Rhodes and Fred Rhodes ("Tyson & Rhodes"). See, Exhibit "A." Pursuant to the terms of the Exclusive Option, MFS Trust had the exclusive right for ninety (90) days to acquire from Tyson & Rhodes an Assignment of Oil & Gas Leases and Bill of Sale covering the thirty (30) oil and gas leases together with all wells, associated equipment, easements and other rights listed on Exhibit A to the Exclusive Option (the "Mineral Interests").

4.      Pursuant to the Exclusive Option, MFS Trust had the option to purchase the Mineral Interests for $525,000.00.

5.    The Exclusive Option required MFS Trust to make a $25,000.00 non-refundable deposit for the exclusive option to purchase the Mineral Interests. Accordingly, the total purchase price MFS Trust would effectively pay Tyson & Rhodes for the Mineral Interests was $550,000.00.

6.    Stephen J. Merrill is an attorney licensed to practice law in the state of Oklahoma. Stephen J. Merrill's Bar number is 6144.

7.    Stephen J. Merrill paid the $25,000 non-refundable deposit to Tyson & Rhodes by issuing a check from his law firm's IOLTA account, which account is an attorney trust account. See, Exhibit "B."

8.    In July and August 2015, Stephen J. Merrill met with Plaintiffs and/or their agents and solicited monies for the purposes of raising $1,000,000 to purchase the Mineral Interests.

9.    All meetings by and between Plaintiffs and Stephen J. Merrill occurred in Oklahoma City, Oklahoma.

10.   By way of example, on July 6, 9, 13, 23, and August 6, 2015, Stephen J. Merrill met with one or more Plaintiffs and/or their agents in Oklahoma City, Oklahoma and solicited monies for the purposes of raising enough funds to acquire the Mineral Interests for $1,000,000.

11.   At all relevant times, Stephen J. Merrill represented to Plaintiffs that the total amount of monies he needed to raise to purchase the Mineral Interests from Tyson & Rhodes was $1,000,000, not $550,000.

12.   At all relevant times, Stephen J. Merrill represented that SBM Energy, LLC ("SBM") had the exclusive option to acquire from Tyson Oil Company the Mineral Interests for $1,000,000. Stephen J. Merrill did not ever disclose to Plaintiffs that the MFS Trust had the right to purchase the Mineral Interests for $550,000 from Tyson and Rhodes.

13.     Based on his actions and representations to Plaintiffs, Stephen J. Merrill was able to coerce and induce Plaintiffs to invest $1,000,000 with him to purchase the Mineral Interests.

14.     As part of the process of inducing Plaintiffs to invest at least $1,000,000, Stephen J. Merrill had Plaintiffs enter into an Exploration Agreement, a copy of which is attached as Exhibit "C." Stephen J. Merrill prepared the Exploration Agreement.

15.     Stephen J. Merrill executed all Exploration Agreements on behalf of SBM.

16.     As set forth in each Exploration Agreement, SBM had the option to purchase the Mineral Interests from Tyson Oil Company for $1,000,000.

17.     Stephen J. Merrill transferred $230,000 of Investors' monies to the MFS Trust account on or about July 15, 2015.

18.     After receiving the $1,000,000 from investors, and on or about September 21, 2015, Stephen J. Merrill transferred $800,000 to the MFS Trust account. Stephen J. Merrill is the trustee and beneficiary of the MFS Trust.

19.     On September 21, 2015, the MFS Trust paid Tyson Oil Company, LLC $525,000. See, Exhibit "D."

20.     Stephen J. Merrill transferred a total of $1,030,000 of Investor's monies, including Plaintiffs, to the MFS Trust bank accounts.

21.     Of the $1,030,000 he transferred, Stephen J. Merrill only used $550,000 to pay Tyson & Rhodes for the Mineral Interests and converted $480,000 for his personal use.

22.     Upon information and belief, Stephen J. Merrill used some of the $1,030,000 to purchase the home in which his wife, Karen Merrill, and he now reside. The home is only in the name of Karen Merrill.

23.     Stephen J. Merrill did not inform Plaintiffs that he would use the investment money for purposes other than exercising the option of the Exclusive Option to purchase the Mineral Interests.

24.     Stephen J. Merrill did not inform Plaintiffs that he was only going to invest $550,000 of the more than $1,000,000 invested by Plaintiffs to purchase the Mineral Interests.

25.     Upon information and belief, Stephen J. Merrill improperly used his law firm's IOLTA account for the purposes of carrying out his scheme to defraud Plaintiffs based on the facts in this Petition.

26.     Stephen J. Merrill is not licensed to sell securities under federal or state law.

27.     Stephen J. Merrill represented to Plaintiffs that he had an IOLTA account and would put Plaintiffs' monies in the account.

28.     Stephen J. Merrill engaged in wire fraud to help perpetrate his scheme to defraud Plaintiffs.

29.     Stephen J. Merrill is the trustee and sole beneficiary of the MFS Trust. Stephen J. Merrill has transferred his personal assets into the MFS Trust to attempt to protect his assets from the reach of creditors.

30.     Stephen J. Merrill took over operations of the Mineral Interests in Kiowa County through SBM Energy and failed to prepare an operating agreement for the operation of the Mineral Interests and wells.

31.     Because Stephen J. Merrill failed to prepare a standard operating agreement for the Mineral Interests, SBM was unable to attach the oil and gas revenues on the 75% working interest of Buford and Helen Williams.

32.     Buford Williams (the largest investor) stopped paying his joint interest billings in approximately February 2016.

33.     When Mr. Williams quit paying his share of the costs to operate the wells then SBM did not have the funds to continue operations.

34.     On September 21, 2016, Buford Williams filed a lawsuit against Stephen J. Merrill, et al. in the Northern District of Oklahoma, Case No. CV-00606-CVE-JFJ.

35.     At the time SBM Energy stopped paying the bills the revenue stopped for all working interest owners, including Plaintiffs.

36.     The revenue for all working interest owners approximated $45,000 per month (assuming oil was selling for $40/bbl).

37.     The revenue lost by Plaintiffs approximated $11,250 per month starting in September 2016.

38.     Thomas Young obtained a judgment against Stephen J. Merrill on May 4, 2016, Case No. CJ-2010-2550, Tulsa County, for $85,652.96. On August 17, 2016, Thomas Young got a judgment for $51,800 for attorney's fees and costs as the prevailing party in the lawsuit.

39.     Stephen J. Merrill resigned as trustee of the MFS Trust at approximately the same time as the filing of the lawsuit by Buford Williams in September 2016. As a result, from and after such time, Karen Merrill was and is the only trustee of the MFS Trust.

40.     On August 11, 2017, Thomas Young filed a Statement of Judgment in Kiowa County regarding the May 4, 2016, judgment against Stephen J. Merrill.

41.     On November 27, 2017, Stephen J. Merrill filed a Quitclaim Assignment & Conveyance in Kiowa County, thereby assigning all his overriding royalty interest in the Mineral Interests and leases to the MFS Trust.

42.    Upon information and belief, over the course of many years going back to at least the late 1990's, Stephen J. Merrill transferred his assets to the MFS Trust. The MFS Trust is a spendthrift trust established by Stephen J. Merrill's father on or about September 30, 1997.

43.    Stephen J. Merrill acted as trustee of the MFS Trust while engaging in the foregoing actions with Plaintiffs.

44.    Based on Stephen J. Merrill's actions the MFS Trust and SBM are liable to Plaintiffs for all damages.

45.    Stephen J. Merrill never disclosed to the Investors the amount of overriding royalty interest he received.

46.    Based on Stephen J. Merrill's actions, Karen Merrill, as trustee of the MFS Trust is liable to Plaintiffs for all damages.

47.    Plaintiffs discovered Stephen J. Merrill's fraudulent actions on or about October 5, 2017.

### FIRST CLAIM FOR RELIEF – FRAUD

### COUNT I

48. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

49. Stephen J. Merrill engaged in a deliberate and intentional scheme of fraud, including wire fraud, from which he derived monetary benefits.

50. Once Stephen J. Merrill had possession of the invested funds, he utilized the United States Banking System, including lines of communication and information technology to convert invested funds for his own use, as well as continue and perpetuate the fraud, thereby committing wire fraud.

51. Merrill used SBM and MFS Trust to perpetrate his fraudulent schemes.

52. Because of Stephen J. Merrill's deliberate and intentional scheme of fraud, including mail fraud and wire fraud, Plaintiffs suffered damages in excess of $75,000.00 as well as attorney fees, costs and interest, and are entitled to judgment against Defendants for damages for the fraud committed by Stephen J. Merrill.

## SECOND CLAIM OF RELIEF – SECURITIES FRAUD

### COUNT I

53. Pursuant to representations made by Stephen J. Merrill, Plaintiffs entered into the Exploration Agreements and invested substantial sums of money with the expectation of receiving working interests in oil and gas investments and with the expectation of receiving a reasonable rate of return upon their investments. Plaintiffs believed the monies they invested would be used by SBM to purchase the Mineral Interests for $1,000,000 from Tyson Oil Company.

54. The acts described in this Petition involve the purchase and sale of securities within the meaning of Section 2(1) of the Securities Act and Section 3(a)(1 0) of the Exchange Act by means of oral communications, by use of the mails, and by the use of the means and instrumentalities of interstate commerce.

55. Oklahoma County is the location where almost all of the actions and occurrences occurred. Stephen J. Merrill participated in the offer and sale of these securities as well as the fraud that resulted therefrom.

56. Stephen J. Merrill made false and misleading statements regarding the cost of the investment and the use of Plaintiffs' investment money and is the primary violator of the actions complained of herein.

57. The securities offered and sold by Stephen J. Merrill to Plaintiffs were in violation of Section 12 (I) of the Securities Act.

58. Plaintiffs have been required to employ attorneys to prosecute this action and are entitled to recover their reasonable attorney's fees and costs as well as damages and attorney's fees and costs for the violation of Section 12(1) of the Securities Act.

59. Stephen J. Merrill used SBM and MFS Trust to perpetrate his fraudulent schemes.

60. Plaintiffs are entitled to a judgment against Defendants for damages in excess of $75,000.00, interest and reasonable attorney's fees and costs for the violation of Section 12(1) of the Securities Act.

<u>COUNT II</u>

61. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

62. Stephen J. Merrill engaged in other manipulative activities and fraudulent courses of conduct regarding his sale of securities to Plaintiffs.

63. Stephen J. Merrill represented that the money invested by Plaintiffs would be used for oil and gas purposes. However, large sums of money have been paid into an account owned or controlled by Stephen J. Merrill or paid personally to him for uses other than what was intended by Plaintiffs.

64. The foregoing misrepresentations and omissions concern material facts that were made in and/or omitted from oral communications from Stephen J. Merrill to Plaintiffs in connection with their purchase of securities from Stephen J. Merrill.

65. When Plaintiffs purchased securities from Stephen J. Merrill, Plaintiffs did not know of the untruth of the facts misstated. Further, Stephen J. Merrill never disclosed the amount of

overriding royalty interest he assigned away from Plaintiffs. Therefore, Stephen J. Merrill violated Section 12(2) of the Securities Act about their sale of these securities to the Plaintiffs.

66. At all relevant times, Merrill used SBM and MFS Trust to perpetrate his fraudulent schemes.

67. Plaintiffs are entitled to judgment against Defendants for damages in excess of $75,000.00, interest and reasonable attorney's fees and costs for the violation of Section 12(1) of the Securities Act.

## COUNT III

68. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

69. Plaintiffs allege that untrue statements of material facts, the omission of material facts and the manipulative and fraudulent activities and the fraudulent course of conduct of Stephen J. Merrill about the sale to Plaintiffs of securities were in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

70. The alleged misstatements were made by Stephen J. Merrill with complete knowledge of their falsity and Stephen J. Merrill knowingly omitted to state to Plaintiffs the facts alleged to have been omitted including, but not limited to, that SBM was not the purchaser of the Mineral Interests, the Mineral Interests were not being purchased from Tyson Oil Company and that the purchase price was $550,000 and not $1,000,000. These facts were material.

71. Plaintiffs did not know of the falsity of Stephen J. Merrill's warranties and representations.

72. Further, Stephen J. Merrill knew certain facts were omitted and Plaintiffs relied upon these statements of facts that were made by Stephen J. Merrill.

73. Therefore, because of these untrue statements, omissions, manipulative and fraudulent activities and fraudulent courses of conduct Plaintiffs have suffered damages more than $75,000.00.

74. The statements made by Stephen J. Merrill were knowingly made with wanton and total disregard of Plaintiffs' rights.

75. Stephen J. Merrill used SBM and MFS Trust to perpetrate his fraudulent schemes.

76. Plaintiffs should be entitled to recover exemplary or punitive damages against Defendants in an amount to be determined by a jury to deter the future conduct of Stephen J. Merrill and to set an example for others not to engage in this course of conduct.

## COUNT IV

77. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

78. Plaintiffs allege that the misstatements, omissions, manipulations and fraudulent activities and the fraudulent conduct of Stephen J. Merrill constitute a violation of Section 17(a) of the Securities Act and, as a result thereof, Plaintiffs have sustained damages in an amount of no less than $75,000.00.


## COUNT V

79. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

80. The actions of Stephen J. Merrill in the offer and sale of the securities to Plaintiffs were violative of the Oklahoma Securities Act.

81. Stephen J. Merrill violated certain provisions of the Oklahoma Securities Act, including 71 O.S. § 509 *et. seq*, because of his scheme and artifice to defraud Plaintiffs by making untrue statements, omitting material facts, and engaging in acts practiced in the course of business which operated as a fraud and deceit upon Plaintiffs in order to entice Plaintiffs into investing in oil and gas schemes perpetrated by Stephen J. Merrill.

82. Stephen J. Merrill made material false representations and his actions were deceitful to Plaintiffs. Stephen J. Merrill was aware that he was misstating material facts and omitting to state material facts to Plaintiffs. Further, Stephen J. Merrill knew Plaintiffs would rely on these representations.

83. Plaintiffs expressly relied upon the misrepresentations of Stephen J. Merrill and the actions of Stephen J. Merrill constituted fraud.

84. The deceit and/or fraud perpetrated by Stephen J. Merrill upon Plaintiffs was knowingly and willfully done by Stephen J. Merrill with total disregard to the rights of Plaintiffs, who relied upon that deceit and/or fraud.

85. Stephen J. Merrill's conduct offends public policy and is unfair and involves practices that are immoral, unethical, oppressive, unscrupulous, and unconscionable.

86. Accordingly, Plaintiffs request that they be awarded punitive and exemplary damages.

87. In all the circumstances, Stephen J. Merrill's extensive unlawful conduct constitutes aggravated misconduct that is morally reprehensible, especially considering the fact that he is an attorney licensed to practice law in the State of Oklahoma.

88. The unlawful conduct of Stephen J. Merrill constitutes intentional or reckless conduct that justifies the imposition of punitive damages against him, pursuant to 23 O.S. § 9.1, in an amount not less than $75,000.

### THIRD CLAIM FOR RELIEF – CONVERSION

### COUNT I

89. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

90. Stephen J. Merrill has converted Plaintiffs' investment money for his own use and benefit.

91. Merrill used SBM and MFS Trust to perpetrate his fraudulent schemes.

92. Because of the Stephen J. Merrill's conversion, Plaintiffs have suffered damages in excess of $75,000 and are entitled to judgment against Defendants.

### FOURTH CLAIM FOR RELIEF – ACCOUNTING

### CLAIM I

93. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

94. Plaintiffs are entitled to a comprehensive accounting of all their oil and gas investments with Stephen J. Merrill. Plaintiffs request a complete accounting for all Defendants for all relevant times.

### FIFTH CLAIM FOR RELIEF – CONSTRUCTIVE TRUST & INJUNCTION

### CLAIM I

95. Plaintiffs reallege all allegations contained in the preceding paragraphs of this Petition.

96. Plaintiffs request a constructive trust be enforced against the assets Stephen J. Merrill acquired with their funds and that the Court issue an injunction against Stephen J. Merrill to restrain them from dispersing all assets he acquired from Plaintiffs' funds.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, Bidarka Gas Corp., an Oklahoma corporation, Duslei Energy, LLC, an Oklahoma limited liability company, Jim Price Oil Co., LLC, an Oklahoma limited liability company, CCJ Ventures, LLC, an Oklahoma limited liability company, Beckham Oil Co., LLC, an Oklahoma limited liability company, Big J's Oil Co., LLC, an Oklahoma limited liability company, Garbet Investments, LLC, an Oklahoma limited liability company, Deborah K. Brandt, an individual, Charles R. Dozier, an individual and Margaret Dozier, an individual pray for judgment against Defendants for the reasons set forth in this Petition and for such other relief as the Court deems equitable.

Respectfully submitted,

Gary D. Hammond, OBA #13825
MITCHELL & HAMMOND
An Association of Professional Entities
512 N.W. 12th Street
Oklahoma City, Oklahoma 73103
405.216.0007 Telephone
405.232.6358 Facsimile
gary@okatty.com Email
**ATTORNEYS FOR PLAINTIFFS**

10/05/2017 14:17 FAX                                                   @004

# EXCLUSIVE OPTION

THIS AGREEMENT, entered into this 25th day of March, 2015, by and between Tyson Oil Company, LLC an Oklahoma Limited Liability Company, GARY MACK TYSON a/k/a GARY TYSON and CAROLYN TYSON, and PAMELA SUE RHODES a/k/a PAM RHODES and FRED RHODES, whose address is 21608 E. 1370 Rd., Hobart, OK 73651 (hereinafter called "ASSIGNOR") and the MFS Trust dated 9/30/97, whose address is 9332 S. Urbana Avenue, Tulsa, OK 74137 (hereinafter called "ASSIGNEE").

WHEREAS, ASSIGNOR represents that ASSIGNOR is the lawful Operator of record for wells located on lands described on Exhibit "A" attached hereto and incorporated herein, all lying in in Kiowa County, Oklahoma.

NOW THEREFORE, ASSIGNOR, for the sum of a TWENTY FIVE THOUSAND DOLLARS ($25,000.00) NON-REFUNDABLE deposit, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell and convey unto ASSIGNEE, for a period of ninety days (90) from the date first above written ("Option Period"), the exclusive option, but not the obligation, to acquire an Assignment of Oil, Gas Leases and Bill of Sale covering the lands above described, together with all equipment and all other rights and privileges necessary, useful and/or convenient in connection therewith.

ASSIGNEE may exercise its option at any time prior to the expiration of the Option Period by tendering the remaining un-paid balance of the agreed-upon purchase price, being the amount of $525,000.00, to ASIGNOR. ASSIGNOR shall deliver an Assignment and Bill of Sale covering all of ASSIGNOR'S interest in and to the Oil and Gas Leases set forth on Exhibit "A", together with all wells, associated equipment, easements, and other rights, to ASSIGNEE. **EXCEPTING AND RESERVING UNTO THE ASSIGNOR A 1/16TH of 8/8THS OVERRIDING ROYALTY INTEREST ON EACH OF SAID LEESES.**

The rights and estate of any party hereto may be assigned from time-to-time in whole or in part. All of the covenants, obligations, and considerations of this EXCLUSIVE OPTION shall extend to and be binding upon the parties hereto, their heirs, successors, and assigns.

ASSIGNOR shall assign and convey all equipment and leases on an as-is, where-is basis and shall make no warranties, either express or implied.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

ASSIGNOR
Tyson Oil Company, LLC

By: Gary Tyson, Member-Manager

EXHIBIT B

Ø003

NAME *Stephen J. Merrill IOLTA*

ACCOUNT NO. *20448422*   DATE *3-27-15*   81-87/829

PAY TO THE ORDER OF *Gary Tyson*   $ *25,000.* ⁰⁰

*Twenty Five Thousand and No/100* DOLLARS

ARVEST BANK   arvest.com

MEMO *deposit at MFS*   *Hobart Prospect*   *Stephen J. Merrill*

⑆103112976⑆ 1004 20448422⑈

Deposit

Exhibit B

## EXPLORATION AGREEMENT

This Exploration Agreement ("Agreement"), effective this _____ day of August, 2015, is by and between SBM Energy, LLC ("SBM"), whose address is 9332 S. Urbana Avenue, Tulsa, OK 74137, and those individuals and/or entities as set forth on Exhibit "A" attached hereto ("Investors"). The parties hereto may be collectively referred to herein as the "Parties".

NOW THEREFORE, in consideration of the sum of TEN dollars, in-hand paid, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree, covenant and contract to the following:

## PHASE ONE

1. **Initial Investment**: Investors shall pay to SBM the sum of one million dollars USD ($1,000,000) which shall be deposited into the SBM Energy, LLC account at Bank of America.

2. **Exercise of Lease Option**: SBM shall exercise its Option to acquire from Tyson Oil Company the leases scheduled in Exhibit "B" attached hereto ("Tyson Leases"), existing production and all associated equipment for $1.0 million, with Tyson Oil Company retaining a 1/16th of 8/8ths overriding royalty interest on all leases.

   a) Each lease covers all depths, from the surface of the Earth to the center of the Earth, with the exception of the Helen Noske lease, covering the NW/4 of section 1-T6N-17W, which is limited to that interval from the surface of the Earth down to and including 2000 feet.

   b) All leases will be delivered at a 75%NRI with the exception of the Pfenning A-C lease covering the SE/4 of section 11-T6N-17W which is already burdened by previous overriding royalty interests and, thus will be delivered at a 70.1325% NRI.

3. **Direct Assignment**: SBM shall assign 100% of its leasehold interest to Investors so that each investor will be paid directly by the oil purchaser in the area, which is currently Murphy Oil Co. Each assignment will expressly state that it is subject to the additional terms and conditions set forth in this unrecorded Exploration Agreement.

*EXHIBIT C*   1

## PHASE TWO

**First Development Cash Call**: SBM needs $500,000 to fund the initial plan of development. Therefore, each Investor shall pay to SBM an additional amount of money equal to 50% of their original investment in order to fund their proportionate share of the following Plan of Development as set forth below.

4. **Formation of Separate Operating Entity**: SBM has formed a separate LLC, being SBM Operating LLC (SBMO), for the purpose of conducting all of the actual operations, thus providing a liability shield to SBM and Investors in the unlikely event of a catastrophic loss of any kind. Therefore, SBMO shall be the official Operator of the Hobart Project.

5. **Allocation of Development Funds**

   | | |
   |---|---|
   | $220,800 | to drill and complete 5 wells in the Hunton Limestone ($44,160 each) |
   | $171,800 | to drill and complete 2 wells in the Simpson ($85,900 each) |
   | $75,000 | to rework 15 existing wells ($5,000 each) |
   | $25,000 | to provide a quality used truck and moving expenses for pumper |
   | $7,400 | to cover miscellaneous expenses |
   | $500,000 | Total Initial Development Funds Budget |

6. **Initial Plan of Development**: SBM intends to implement a 3 part initial drilling and development program ("Phase 1").

   a) SBM will drill and complete 5 Hunton wells on the Krigbaum Lease on the W/2 of section 30 at a rate of one per every two days. The first 4 will be located as close as legally possible to the centerline fence on the East side, and the 5th will be located in the far northwest corner of the W/2, where some of the better existing wells are located (These existing wells were never acidized either.)

   b) SBM will drill and complete 2 Simpson wells on the Weigandt Lease on section 15 at a rate of one per every three to four days. The first 2 will be located as close as legally possible to the acreage line closest to Devon and Jubilee's recent discovery.

   c) SBM will perform reworks on 15 wells, many of which will be located on leases other than the Krigbaum and Weigandt to preserve their HBP status.

*Exhibit C*   2

7. <u>Overall Plan of Development</u>:

    1. Purchase leases and producing wells, thereafter, concept is to drill new wells out of cash flow that is distributed to investors.

    2. Drill **Phase I** which is 5 Hunton, 2 Simpson wells and refurbish 15 wells. (42 wells)

    3. Start **Phase II** (drill 10 wells refurbish 15 wells) only after complete project payout or upon 75% in interest approval by investor group whichever is earlier. Estimate start Feb-April 2016. (67 wells)

    4. Upon payout of Phase II drilling costs from all revenues or 75% in interest approval by investor group whichever is earlier start **Phase III** (drill 10 wells and refurbish 15 wells) approximately Aug-Oct 2016. (92 wells)

    5. Upon payout of Phase III drilling costs from all revenues (Phase I, II, and III) or 75% in interest approval by investor group whichever is earlier start **Phase IV** (drill 10 wells and refurbish 15 wells) in approximately Feb-April 2017. (117 wells)

    6. Upon payout of Phase IV drilling costs from all revenues or 75% interest in approval of investor group start **Phase V** (drill 10 wells) in approximately Aug-Oct 2017. (127 wells)

    7. At this point, we will have serious conversations with Investors about selling the whole program out to a new ownership group.

8. <u>Payout Defined</u>: "Payout" shall be defined as such time that Investors have received (or have been credited with) revenue from this project equal to the total amount paid by Investors, including both the Investors' lease acquisition costs <u>and</u> the total amount expended by the Investors to re-work existing wells and to drill and complete new wells, up to that point in time.

9. <u>Broker Compensation</u>: Because both SBM and Investors mutually benefited from the use of broker(s), who facilitated communication between Parties that led to this exploration initiative, the broker(s) shall receive, out of the first production revenue before Investor Payout, a sum of money equal to 5% of the money raised

*EXHIBIT C*  3

(for the lease ($1,000,000) and initial development budget ($500,000), totally to $75,000.

10. **After Payout**: At Payout, SBM shall automatically back-in for a 20% working interest with regard to all existing and future wells and production therefrom. From that date forward, SBM will be responsible to pay its proportionate share of all expenses incurred in the future drilling and development of the Hobart Project. SBM will also submit revised division orders for each of the Tyson Leases to Murphy that reflects the new pay decimals for each Investor and SBM.

11. **Payment of Expenses**: SBM shall transfer funds to SBMO, as needed, to timely pay all invoices properly incurred in the operation and development of the Hobart Project, but will maintain only a nominal balance of funds in SBMO for further liability protection.

12. **Compensation of SBM and SBMO**: SBM and SBMO shall be compensated as follows:

a) The principals of SBM and SBMO, or affiliates thereof, can provide contract services to SBM based upon competitive rates in the area for similar services. This will include, but not be limited to, services for title opinions, drilling contracts, contracts for site preparation, general roustabout services and engineering or geologic consulting, as needed. However, any relationship with any service provider, whether affiliated with SBM or not, can be terminated for cause by a vote of Investors owning a majority interest in the Hobart Project.

b) SBMO shall hire a pumper for the Hobart Project at a flat rate of $5,000 per month and SBMO shall provide the pumper with a company vehicle (a used, but serviceable, pick-up truck) and a gas card to be used only for the company vehicle. SBMO shall also reimburse the pumper for his one-time, reasonable moving expenses in order to relocate to the immediate vicinity. If/when hundreds of wells per month are pumping, we will likely need to increase our pumper compensation to remain an attractive employer.

c) SBM shall also initially receive an additional $5,000 per month to cover other monthly operating expenses including electricity and insurance, in addition to general administrative services and supervision. These expenses will increase reasonably with each new phase of development.

## FUTURE PLANS OF DEVELOPMENT:

1. **Evaluation Period**: After the Initial Plan of Development has been completed, SBM anticipates that there will be a currently undetermined period of time wherein

*EXHIBIT C* 4

SBM and Investors monitor the production levels of the new Hunton wells, new Simpson wells, and the reworks of the existing wells. This time period shall also allow for a significant build-up of cash flow to Investors.

2. <u>New Plan of Development</u>: Based upon the results of the valuation period, SBM and Investors will have a meeting to determine how best to proceed. All Investors will be invited but no Investor is required to attend. SBM anticipates that the initial results will justify moving forward with additional drilling and development, and discussions will be primarily about prioritizing which zones to drill first on which leases. We will also consider how aggressive our new drilling plan should be. At this point in time, it will be likely that additional drilling could be funded solely from cash flow, but it may still be advantageous to have a second cash call, in excess of distributions received, to drill more quickly. Also, it is possible that we will encounter one or more additional zones that appear to be productive and may influence our discussions and decisions.

## GENERAL PROVISIONS:

13. <u>Regular Investor Meetings</u>: During the active drilling phase, SBM proposes monthly meetings with the Investors in order to keep them apprised of the progress, the outcomes, and also any challenges that we may have encountered. SBM recommends quarterly Investor meetings when there is not an active drilling phase. SBM will constantly be monitoring the results of each well and will seek input from Investors so that the Parties can make the best financial decisions possible. For instance, if the Simpson wells are far better than the Hunton wells, we will recommend shifting more of the budget to the drilling of Simpson wells, etc. SBM will also be looking for ways to minimize costs as long as it doesn't jeopardize the results. For instance, if SBM can identify a useable borehole that can be re-entered and deepened instead of drilling a new hole, we will, assuming all other considerations are equal.

14. <u>Regular Reporting to Investors</u>: SBM will furnish daily drilling reports when wells are being drilled and monthly reports when production has been sold.

15. <u>Open Book Policy</u>: All of the books of both SBM and SBM Operating LLC will be open for review upon request.

16. <u>Transfer of Working Interest</u>: It is imperative that we maintain undivided ownership interest in all wells on all leases of this program because the oil on each lease flows into the same tank batteries, and it would create undue burden to install separate sets of tanks on individual leases for pools of different Investor ownership. If any Investor, or its heirs, successors or assigns, opts to not participate

*EXHIBIT C* 5

in full or in part in a future phase of development, for which there is at least 75% Investor interest support in a formal written vote, they must sell all of their interest for which they no longer desire to pay their share of expenses. The transfer of working interest shall be governed by the following rules and procedures:

a) Any Investor wishing to sell all or part of their interest ("Selling Investor") must submit a written statement declaring their specific desires to SBM, who will then circulate the memorandum of sale via email to all other ongoing Investors in the Tyson Leases ("Continuing Investors").

b) All Continuing Investors may submit written bids to SBM for the purchase of the working interest for sale during a bidding period of 3 weeks, starting from the date the memorandum of sale is circulated to all Continuing Investors via email. Additionally, the Selling Investor may also wish to secure a bona fide written and binding offer from an outside party and then email the documentation to SBM, who will then circulate the offer to all Continuing Investors.

c) Continuing Investors have the right of first refusal to match the highest offer be it internal or external, such that they may acquire additional pieces of available interest pro rata to their total working interest in the Tyson Leases. Continuing Investors have a 2 week action window from the close of the 3 week bidding window to submit payment for their desired additional working interest or to waive their right of first refusal. If a Continuing Investor doesn't respond within the 2 weeks, the default assumption is that they waive their right of first refusal to acquire more interest.

d) If one, or more, of the other Continuing Investors elects not to acquire their proportionate share, then a 1 week cleanup period will begin wherein SBM shall have the right of first refusal, but not the obligation, to acquire the remaining interest at the same price. All other Continuing Investors have the second right of refusal to secure whatever interest remains pro rata to the total interest of all of the Continuing Investors wishing to acquire the remaining interest.

e) Should there be any remaining working interest that no Continuing Investor acquires during the 1 week cleanup window, the Selling Investor has 3 additional weeks to sell their undesired working interest to external funding sources. All transfer of working interest to an outside source is contingent upon the new investor agreeing to pay their share of expenses for the next distinct phase of development for which there is a formal 75% vote of Investor approval and to enter into a right of first refusal agreement with

*Exhibit C* 6

Continuing Investors with respect to their ability to eventually sell their interest.

f) All working interest sold shall remain subject to the terms of this unrecorded exploration agreement.

17. **Funds Escrowed**: Upon request of the individual Investor, Steve Merrill will temporarily hold funds in escrow until the full $1,000,000 is raised to exercise the option. Stephen J. Merrill is a licensed attorney in the State of Oklahoma who has a Client Trust Account at Arvest Bank.

18. **Counterpart Execution**: The Parties hereto do hereby agree and consent that Investors are not required to execute the same original Exploration Agreement document and that execution of a separate execution page shall be treated for all purposes as if each investor had executed the original Exploration Agreement.

19. **Disclaimer**: By executing this agreement, each Investor acknowledges that he/she is aware that oil and gas investments carry many inherent risks and that it is possible that part or all of their investment could be lost. Each Investor further represents that they are an Accredited and sophisticated Investor and/or oil and gas professional familiar with the risks of oil and gas ventures.

Executed this _12th_ day of ~~August~~ October, 2015.

_Stephen J. Merrill_, President and Managing Member of SBM Energy, LLC

1)
- Investor Signature: _James Ell_
- Printed Name: _James R. Price, President_
- Entity Name for official owner: _Bidarka Gas Corp._
- Address: _7201 N. Classen Blvd Ste 202 Oklahoma City, O._
- Phone Number: _405-848-3030_ or _405-812-3755_    7311
- Email Address: _Price @ ionet. net_
- Investment Size: $ _50,000_      (Total of $1,000,000 for Lease)
- Working Interest: _Five percent 5_ %
- Date: _August 4th 2015_       TAX ID _73 - 1472023_

2)
- Investor Signature: _James Ell_
- Printed Name: _James R. Price, Manager_

_EXHIBIT C_ [7]

- Entity Name for official owner: _Dusfei Energy LLC_
- Address: _726i N. Classen Blvd Ste 262, Oklahoma City, Ok_
- Phone Number: _405-848-3030_
- Email Address: _price @ ionct. net_
- Investment Size: $ _50,000_ (Total of $1,000,000 for Lease)
- Working Interest: _five percent 5_ %    _TAX ID 73-147 2890_
- Date: _8-4-15_

3)
- Investor Signature: _(signature)_
- Printed Name: _JAMES R. PRICE Manager/Member_
- Entity Name for official owner: _Jim Price Oil Co. LLC_
- Address: _7204 N. Classen Ste 202 Okc Ola 73116_
- Phone Number: _405-812-3755_
- Email Address: _price @ ionet. net_
- Investment Size: $ _20,000_ (Total of $1,000,000 for Lease)
- Working Interest: _Two percent 2_ %    _TAX ID ____
- Date: _8-4-15_

4)
- Investor Signature: _____
- Printed Name: _____
- Entity Name for official owner: _____
- Address: _____
- Phone Number: _____
- Email Address: _____
- Investment Size: $ _____ (Total of $1,000,000 for Lease)
- Working Interest: _____ %
- Date: _____    _TAX ID _____

_EXHIBIT C_    8

10/03/2017 14:17 FAX

@002

## ARVEST
### BANK
P.O. Box 791
Lowell, AR 72745

3951088

NOTICE TO CUSTOMERS
THIS PURCHASE OF AN INDEMNITY BOND WILL BE REQUIRED
BEFORE ANY OFFICIAL CHECK OF THIS BANK WILL BE REPLACED
OR REFUNDED IN THE EVENT IT IS LOST, MISPLACED OR STOLEN
THE BANK IS NOT OBLIGATED TO TAKE ANY ACTION ON THE
ABOVE UNTIL THE 90TH DAY AFTER DATE OF ISSUANCE

REMITTER MFS TRUST UAD 093097
Br 551

DATE September 21, 2015

81-87/829
11633621

PAY TO THE
ORDER OF     TYSON OIL COMPANY, LLC.
THIS DOCUMENT HAS A MICRO PRINT SIGNATURE LINE, WATERMARK AND A MICROSCAN SEAL ABSENCE OF THESE FEATURES WILL INDICATE A COPY

$     525,000.00

PAY
EXACTLY **525,000**DOL **00**CTS

DOLLARS

## CASHIER'S CHECK
ACQUIRE LEASES FOR HOBART

⑈3951088⑈ ⑈08290008721⑈ 11633621⑈

EXHIBIT D

3.27-15                   $ 25,000

9-21-15                   525,000
                        _____

                          550,000


for contract    1,000,000
                        _____

                     $ 450,000 difference


Where did this Money go ?


w/ EXHIBIT D