**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

BIDARKA GAS CORP., an Oklahoma )
corporation; DUSLEI ENERGY, LLC, an )
Oklahoma limited liability company; JIM )
PRICE OIL CO., LLC, an Oklahoma )
limited liability company; CCJ )
VENTURES, LLC, an Oklahoma limited )
liability company; BECKHAM OIL CO. )
LLC, an Oklahoma limited liability )
company; BIG J'S OIL CO. LLC, an )
Oklahoma limited liability company; )
GARBET INVESTMENTS LLC, an )
Oklahoma limited liability company; )
DEBORAH K. BRANDT, an individual; )
CHARLES R. DOZIER, an individual; and )
MARGARET DOZIER, an individual, )
 )
     Plaintiffs, )
 )
v. )     Case No. CIV-18-00041-PRW
 )
STEPHEN J. MERRILL, individually and )
as Trustee of the MFS Trust Dated September )
30, 1997; KAREN MERRILL, individually and )
as Trustee of the MFS Trust Dated September )
30, 1997; SBM ENERGY, LLC, an )
Oklahoma limited liability company; )
MFS TRUST DATED SEPTEMBER 30, )
1997; and DONALD F. SCHNELL, )
individually, )
 )
     Defendants. )

## MEMORANDUM OPINION AND ORDER

On March 25, 2019, Plaintiffs filed a Motion for Summary Judgment and

Supporting Brief (Dkt. 29) pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

Three days prior to that, the Court Clerk entered default against Defendant Donald F.

Schnell for failure to plead or otherwise defend the action after being personally served

1

one year earlier.[1] Although the deadline for the remaining Defendants—husband and wife Stephen J. and Karen Merrill, both individually and as trustees of the Merrill Family Spendthrift Trust Dated September 30, 1997; his oil exploration company, SBM Energy, LLC; and their family trust, the Merrill Family Spendthrift Trust Dated September 30, 1997 (collectively "the Merrill Defendants)—to respond to Plaintiffs' summary judgment motion was April 15, 2019, no responses were filed until June 12, 2019,[2] and then only on behalf of Mr. and Mrs. Merrill in their dual capacities.[3] Upon review of the parties' filings, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion for Summary Judgment (Dkt. 29) as set forth more fully below.

### Burden of Proof

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1] Clerk's Entry of Default (Dkt. 27) at 1; *see also* Proof of Serv. (Dkt. 22) at 2 (certifying that James C. Reynolds "personally served the summons on the individual at *(place)* _13690 S. 4070 Rd, Oologah, OK_ on *(date)* _3-29-18_")

[2] The reasons for the delayed responses were the withdrawal of the attorneys representing the Merrill Defendants on April 11, 2019, Order (Dkt. 30) at 1; the reassignment of this case to the undersigned judge on April 19, 2019, Enter Order (Dkt. 33) at 1; the Court's extension of the response deadline to June 11, 2019, due to the circumstances, Order (Dkt. 34) at 9; and the Merrill Defendants' inability to secure alternative counsel on or before June 11, 2019, Order (Dkt. 47) at 7-8.

[3] The reasons why responses were not filed on behalf of SBM Energy and the MFS Trust were the Court's warnings to Mr. and Mrs. Merrill that the law prevents them from appearing *pro se* on behalf of the limited liability company or the trust and that those entities must hire counsel to defend the lawsuit and respond to Plaintiffs' summary judgment motion, the Merrill Defendant's inability to secure alternative counsel, and the Court's Order (Dkt. 47) eventual entry of default against SBM Energy and the MFS Trust on July 1, 2019. Order (Dkt. 35) at 3–4; Order (Dkt. 41) at 5–7; Order (Dkt. 47) at 2, 7-10.

judgment as a matter of law." In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines only whether there is a genuine dispute for trial before the fact-finder(s).[4] The movant bears the initial burden of demonstrating the absence of a genuine, material dispute and an entitlement to judgment.[5] A fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim.[6] A dispute is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.[7]

If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine dispute"; or by "showing . . . that an adverse party [i.e., the movant] cannot produce admissible evidence to support the fact."[8] The nonmovant does not meet its burden by

---

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015).

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6] *Anderson*, 477 U.S. at 248; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[7] *Id.*

[8] Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. 317; *Beard v. Banks*, 548 U.S. 521, 529 (2006).

"simply show[ing] there is some metaphysical doubt as to the material facts,"[9] or by theorizing a "plausible scenario" in support of its claims.[10] "Rather, 'the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[11] If there is a genuine dispute as to some material fact, the district court must consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party.[12]

### *Undisputed Material Facts*

Included here are those material facts supported by the record and not genuinely disputed in the manner required by Rule 56(c). These facts are now established in the case pursuant to Rule 56(g).

Defendant Stephen J. Merrill holds himself out as an Oklahoma attorney "ha[ving] more than 37 years of experience in the oil and gas industry" who "specializ[es] in oil and gas title opinions and litigation" but who also remains "active in the exploration and production side of the industry."[13] Defendant Donald Schnell is a business associate of Mr.

---

[9] *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995)).

[10] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[11] *Neustrom*, 156 F.3d at 1066 (quoting *Anderson*, 477 U.S. at 251–52; *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993)).

[12] *Scott*, 550 U.S. at 380; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

[13] SBM Energy, LLC Business Plan (Dkt. 29-1) Ex. I, at 44.

Merrill who describes himself as "a third[-]generation driller" who, "by all accounts, is a foremost expert in shallow production."[14] Defendant Karen Merrill is Mr. Merrill's wife.[15] Defendant The Merrill Spendthrift Trust Dated September 30, 1997 (hereinafter "the MFS Trust") appears to be a revocable living trust established by Mr. Merrill's father, J.C. Merrill, purportedly to protect Mr. Merrill's assets during a divorce and to provide for succession of his parents' estates.[16] Though the exact circumstances are unclear, Mr. Merrill eventually became sole trustee of the MFS Trust sometime around his father's death in 2011[17]; and in March of 2017, Mr. Merrill made Mrs. Merrill a co-trustee to facilitate their purchase of a home located in Owasso, Oklahoma.[18] Lastly, Defendant SBM Energy, LLC is an Oklahoma limited liability company that Mr. Merrill formed in 2015 to acquire some oil and gas leasehold interests in Kiowa County, Oklahoma,[19] as described more fully below.

---

[14] *Id.*; *see also* Stephen Merrill Aff. (Dkt. 44-1) ¶ 1, at 1.

[15] Trustee Resolution (Dkt. 29-2) Ex. P, at 34 (Mar. 28, 2017); Stephen Merrill Aff. (Dkt. 44-1) ¶ 18, at 3.

[16] E-mail from Steve Merrill to James Price (Dkt. 29-2) Ex. J, at 1 (Nov. 14, 2017, 11:58 AM).

[17] *Compare id.* (stating that Mr. Merrill's father made Mr. Merrill's law partner, Wilson Busby, a co-trustee and that Mr. Merrill became a co-trustee with Mr. Busby after his father passed), *with* Memorandum of Trust (Dkt. 29-2) Ex. Q, at 35 (filed May 23, 2014) (stating that Mr. Merrill's father made Mr. Merrill a co-trustee in 2009 and that Mr. Merrill became the sole trustee upon the passing of his father in 2011).

[18] Trustee Resolution (Dkt. 29-2) Ex. P, at 34 (Mar. 28, 2017); Trustee Resolution (Dkt. 29-2) Ex. O, at 31 (Mar. 29, 2017).

[19] E-mail from Merrill to Price (Dkt. 29-2), *supra* note 16, Ex. J, at 1; *see also* Executive Summary (Dkt. 29-1) Ex. G, at 25.

In late February or early March of 2015, Mr. Merrill and Mr. Schnell approached Gary Tyson of the Tyson Oil Company, LLC about purchasing approximately twenty-seven oil and gas leases that his company held in Kiowa County, along with all wells, associated equipment, easements, and other associated rights.[20] Mr. Merrill hoped to use the cash flow from the pre-existing producing wells on those leases to fund both the refurbishing of some pre-existing wells and the drilling of new wells into the Hunton Limestone and Simpson formations.[21] Mr. Merrill and Mr. Tyson eventually settled on a price of $550,000.00, but Mr. Merrill wanted 90 days to gather funding.[22] So Mr. Tyson agreed to hold the leasehold interests for Mr. Merrill in exchange for payment of some earnest money. On March 25, 2015, Mr. Tyson—acting on behalf of his company, himself, Carolyn Tyson, Pamela Sue Rhodes, and Fred Rhodes—signed an Exclusive Option Agreement memorializing the agreement.[23] By its terms, in exchange for payment of a $25,000.00 non-refundable deposit, Mr. Tyson agreed to give the MFS Trust 90 days to exercise an exclusive option to acquire the leasehold interests by tendering the unpaid

---

[20] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 5, at 5; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 5, at 2 ("Admitted," but clarifying that he was purchasing "leasehold interests" rather than "Mineral Interests"); Tyson Aff. (Dkt. 29-3) Ex. X, ¶ 1, at 38.

[21] *See* Exploration Agreement (Dkt. 29-1) at 5.

[22] *See* Tyson Aff. (Dkt. 29-3) Ex. X, ¶¶ 2–3, at 39; Exclusive Option (Dkt. 29-1) Ex. A, at 1.

[23] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 5, at 5; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 5, at 2 (admitting these facts, with the clarification noted *supra* at note 20); Exclusive Option (Dkt. 29-1) Ex. A, at 1.

balance of $525,000.[24] Two days later, Mr. Merrill, paid the $25,000.00 non-refundable deposit to Mr. Tyson by issuing a check from his law firm's IOLTA trust account.[25] Consequently, Mr. Merrill had until June 23, 2015, to raise the additional $525,000.00 needed to purchase Tyson's leasehold interests.

Little is known about Mr. Merrill's efforts to secure funding between March 27 and June 23, 2015. An affidavit from Mr. Tyson indicates that a closing was set up for June 23rd, but that Mr. Merrill called approximately three hours beforehand to request more time, which Mr. Tyson permitted.[26] A "few" weeks later, a second closing was scheduled, but Mr. Merrill again informed Mr. Tyson that he wasn't ready to close.[27]

In July and August of 2015, Mr. Merrill and Mr. Schnell met with Plaintiffs and several others to solicit investment funding for acquisition of the Kiowa County leasehold interests.[28] Five people representing seven of the ten Plaintiffs—i.e., Deborah K. Brandt, James Dustin Price of CCJ Ventures LLC, Joe Lindsey of Big J's Oil Co. LLC, Michael Beckham of Beckham Oil LLC, and James R. Price of Jim Price Oil Co. LLC, Duslei Energy LLC, and Bidarka Gas Corp.—have produced affidavits concerning what was

---

[24] Pls.' Mot. Summ. J. (Dkt. 29) ¶¶ 5–7, at 5–6; Def. Stephen Merrill's Resp. (Dkt. 44) ¶¶ 5–7, at 2 (admitting everything, with the clarification noted *supra* at note 20); Exclusive Option (Dkt. 29-1) Ex. A, at 1.

[25] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 8, at 6; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 8, at 2 ("Admitted."); Exclusive Option (Dkt. 29-1) Ex. A, at 1; Check (Dkt. 29-1) Ex. B, at 2.

[26] Tyson Aff. (Dkt. 29-3) Ex. X, ¶ 4, at 39.

[27] *Id.* ¶ 5, at 39.

[28] Pl.'s List of Admitted Compl. Paragraphs (Dkt. 29-4) Ex. AA, ¶ 10, at 1

discussed at those meetings.[29] Plaintiffs have also obtained affidavits from five other people who attended those same meetings but decided not to invest.[30] Nine affiants represent that Mr. Merrill said he needed to raise $1,000,000.00 to purchase the leasehold interests from Tyson.[31] One of the non-parties recalls Mr. Merrill stating that SBM Energy, LLC had the exclusive option to acquire the leasehold interests and produced documentation from the meeting held July 27, 2015, indicating that, upon "Investors . . . paying to SBM the sum of one million dollars USD ($1,000,000)[,] . . . SBM shall exercise its Option to acquire from Tyson Oil Company the leases scheduled in Exhibit 'B' attached hereto ('Tyson Leases'), existing production and all associated equipment for $1.0 million."[32] Seven of the affiants state that Mr. Merrill never mentioned the MFS Trust at

---

[29] Brandt Aff. (Dkt. 29-3) Ex. X, at 22; James D. Price (CCJ Ventures LLC) Aff. (Dkt. 29-3) Ex. X, at 26; Lindsey (Big J's Oil Co. LLC) Aff. (Dkt. 29-3) Ex. X, at 28; Beckham (Beckham Oil LLC) Aff. (Dkt. 29-3) Ex. X, at 30; James R. Price (Jim Price Oil Co., LLC) Aff. (Dkt. 29-3) Ex. X, at 32; James R. Price (Duslei Energy LLC) Aff. (Dkt. 29-3) Ex. X, at 34; James R. Price (Bidarka Gas Corp.) Aff. (Dkt. 29-3) Ex. X, at 36.

[30] Brenner Aff. (Dkt. 29-3) Ex. X, at 2; Dennis Aff. (Dkt. 29-3) Ex. X, at 4; Redd Aff. (Dkt. 29-3) Ex. X, at 18; Bradford Aff. (Dkt. 29-3) Ex. X, at 20; Dozier Aff. (Dkt. 29-3) Ex. X, at 24.

[31] Brenner Aff. (Dkt. 29-3) Ex. X, at 3; Dennis Aff. (Dkt. 29-3) Ex. X, ¶ 1, at 4; Redd Aff. (Dkt. 29-3) Ex. X, at 18–19; Bradford Aff. (Dkt. 29-3) Ex. X, at 21; Dozier Aff. (Dkt. 29-3) Ex. X, at 25; James D. Price (CCJ Ventures LLC) Aff. (Dkt. 29-3) Ex. X, at 27; Lindsey (Big J's Oil Co. LLC) Aff. (Dkt. 29-3) Ex. X, at 29; Beckham (Beckham Oil LLC) Aff. (Dkt. 29-3) Ex. X, at 31; James R. Price (Jim Price Oil Co., LLC) Aff. (Dkt. 29-3) Ex. X, at 33; James R. Price (Duslei Energy LLC) Aff. (Dkt. 29-3) Ex. X, at 35; James R. Price (Bidarka Gas Corp.) Aff. (Dkt. 29-3) Ex. X, at 37.

[32] Dennis Aff. (Dkt. 29-3) Ex. X, ¶ 1, at 4; Unexecuted Exploration Agreement (Dkt. 29-3) Ex. X, ¶¶ 1–2, at 6

the meetings.[33] Mr. Merrill admits that he "did not ever disclose to Plaintiffs that the MFS Trust had the right to purchase the Mineral Interests for only $550,000 from Tyson & Rhodes."[34] By one affiant's account, he asked Mr. Merrill if the investors could directly "contact Tyson to see if he would take $600,000 or $700,000 for the leases," but Mr. Merrill assured him "that Tyson would not take less than $1,000,000" and told him that no one should contact Mr. Tyson.[35]

Mr. Merrill eventually convinced Plaintiffs to invest $250,000.00 with him for purchasing the leasehold interests and an additional $125,000.00 for further exploration and development.[36] Between July 8 and October 22, 2015, the Plaintiffs executed Exploration Agreements with SBM Energy, LLC and submitted $250,000 to be used for purchasing the leasehold interests—giving Plaintiffs a 25% interest in the Kiowa County leasehold interests.[37] Mr. Merrill and Mr. Schnell also convinced Buford and Helen

---

[33] Dennis Aff. (Dkt. 29-3) Ex. X, ¶ 5, at 4; Dozier Aff. (Dkt. 29-3) Ex. X, at 25; James D. Price (CCJ Ventures LLC) Aff. (Dkt. 29-3) Ex. X, at 27; Lindsey (Big J's Oil Co. LLC) Aff. (Dkt. 29-3) Ex. X, at 29; Beckham (Beckham Oil LLC) Aff. (Dkt. 29-3) Ex. X, at 31; James R. Price (Jim Price Oil Co., LLC) Aff. (Dkt. 29-3) Ex. X, at 33; James R. Price (Duslei Energy LLC) Aff. (Dkt. 29-3) Ex. X, at 35; James R. Price (Bidarka Gas Corp.) Aff. (Dkt. 29-3) Ex. X, at 37.

[34] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 11, at 7; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 11, at 2 ("Admitted," but with the addition of a "relevant predicate" by which Mr. Merrill attempt to justify his mark-up from $550,000 to $1,000,000)

[35] Dozier Aff. (Dkt. 29-3) Ex. X, at 25.

[36] *See* Pls.' Mot. Summ. J. (Dkt. 29) ¶ 12, at 7 (asserting that Mr. Merrill "coerced and induced" Plaintiffs to invest); Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 12, at 2–3 (denying the asserted fact on the sole basis that he "never coerced, or attempted to coerce, any of the Plaintiffs, or anyone else for that matter, to invest in SBM's Hobart Prospect")

[37] *See* Pls.' Mot. Summ. J. (Dkt. 29) ¶¶ 13–14, at 7 (asserting payment of $250,000 to SBM Energy, LLC to acquisition of the leasehold interests); Def. Stephen Merrill's Resp. (Dkt.

Williams to invest the remaining $750,000 needed to purchase the leasehold interests and an additional $375,000.00 for further exploration and development; the Williamses sent a wire transfer of $1,125,000.00 to Mr. Merrill on September 21, 2015.[38]

On the same day he received the Williamses' money, Mr. Merrill made an $800,000 transfer and a $200,000 transfer from SBM Energy, LLC's account at Bank of America to the MFS Trusts' account at Arvest Bank.[39] He also obtained a cashier's check from the MFS Trust's account made payable to Tyson Oil Company, LLC in the amount of $525,000 and purchased the leasehold interests,[40] leaving a remainder of $475,000.00. Because Mr. Merrill and Mr. Schnell treated the remainder as a mark-up, they split it evenly

---

44) ¶¶ 13–14, at 3 (acknowledging receipt of $375,000 from Plaintiffs, of which $250,000 was transferred to the MFS Trust for purchase of the leasehold interests, and acknowledging that Plaintiffs and SBM Energy, LLC executed Exploration Agreements); Bidarka Gas Corp., Duslei Energy LLC, and Jim Price Oil Co. LLC's Exploration Agreement (Dkt. 29-1) Ex. C, at 3–10; Pl.'s Checks (Dkt. 29-2) Ex. W, at 51–62 (showing receipt of $257,500 from Plaintiffs).

[38] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 16, at 7 (asserting that Mr. Merrill "coerced Buford and Helen Williams to invest $750,000); Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 16, at 3 (denying the asserted fact on the sole basis that the Williamses "were not coerced"); Compl. (Dkt. 29-2) Ex. L, ¶ 13, at 18, *Williams v. Merrill*, No. 4:16-cv-00606-TLW (N.D. Okla. filed Sept. 21, 2016) (asserting that the Williamses sent a wire transfer of $1,125,000 to Mr. Merrill, of which $750,000 was to be used for purchasing the leasehold interests).

[39] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 18, at 8; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 18, at 3 ("Admitted."); Arvest Statement for Account No. XXXXX0367 (Dkt. 29-2) Ex. V, at 46, 49 (showing "ELECTRONIC ACTIVITY" on 9/21/15 with a description of "SBM ENERGY LLC" and an amount of $800,000.00 and showing a deposit slip dated 9/21/15 in the amount of $200,000.00).

[40] Pls.' Mot. Summ. J. (Dkt. 29) ¶¶ 19–20, at 8; Def. Stephen Merrill's Resp. (Dkt. 44) ¶¶ 19–20, at 3 ("Admitted."); Cashier's Check (Dkt. 29-1) Ex. D, at 11; Arvest Statement for Account No. XXXXX0367 (Dkt. 29-2) Ex. V, at 48–49 (showing a "CHECK[] PAID" on 9-21 in the amount of $525,000.00 and a checking/money market withdrawal slip dated 9/21/15 in the amount of $525,000.00 with the memo "Tyson Oil Company, LLC").

between themselves. Mr. Merrill kept his \$237,500 in the MFS Trust account and wrote Mr. Schnell a \$237,500 check from the MFS Trust account.[41] What happened to the mark-up money from there is either unknown or disputed.[42]

Upon purchase of the leasehold interests, it appears the MFS Trust assigned "**an overriding royalty interest equal to the difference between 25% and existing lease burdens, *if any,*** as to each and every lease" to Russell Dozier and SBM Energy, LLC's management team[43]—which included Mr. Merrill (President), Mr. Schnell (Vice President of Operations), Cody Merrill (Vice President of Finance), and John Helton (Geologic Consultant).[44] SBM Energy, LLC then assigned all of the remaining 75% net revenue

---

[41] Pls.' Mot. Summ. J. (Dkt. 29) ¶ 21, at 8; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 21, at 3 ("Admitted."); Check to Schnell (Dkt. 29-1) Ex. E, at 13; Arvest Statement for Account No. XXXXX0367 (Dkt. 29-2) Ex. V, at 48, 50 (showing a "CHECK[] PAID" on 9-21 in the amount of \$237,500.00 as well as an image of that check).

[42] The parties' briefing on summary judgment is silent on what happened to the money. But other filings have offered possible explanations.

In their Amended Complaint (Dkt. 3), Plaintiffs alleged "[u]pon information and belief" that Mr. Merrill and his wife used some of the money he kept "to purchase the home in which his wife, Karen Merrill, and he now reside." Pls.' Am. Compl. (Dkt. 3) ¶ 24, at 5. But the Merrill Defendants denied such allegations in their Answer (Dkt. 6), stating that "Defendants Merrill sold their Tulsa home of 20 years in <u>May of 2017 (two years later)</u> and bought a different, and much smaller home, in Owasso" and that "[a]bsolutely no investor money was used!" Defs. (1), (2), (3) & (4) Answer (Dkt. 6) ¶ 22, at 3.

In his Proposed Findings of Fact and Conclusions of Law (Dkt. 67), Mr. Merrill seemingly suggests that some of the mark-up money was used to buy a pulling unit and a water truck that SBM Energy, LLC used solely on the Kiowa County leases purchased from Tyson. But the source of the money used to buy that equipment is not explicitly stated. *See* Def. Stephen Merrill's Proposed Findings of Fact & Conclusions of Law (Dkt. 67) ¶ 39, at 9.

[43] Assignment of Overriding Royalty Interest (Dkt. 29-1) Ex. F, at 15; *see also* Exploration Agreement (Dkt. 29-1) Ex. C, ¶ 2(b), at 3 (discussing delivery to the Investors of 75% net revenue interest in all leases).

[44] Business Plan (Dkt. 29-1) Ex. I, at 44–45.

interest to Plaintiffs and the Williamses.[45] This made Plaintiffs and the Williamses working interest owners.[46] Under the terms of the Exploration Agreement, Plaintiffs and the Williamses would receive their portion of revenue from any producing wells through direct payment by the oil purchaser, Murphy Oil Co., until they recouped their initial investments that totaled $1,500,000.00.[47] After such recoupment or "payout," SBM Energy, LLC would "automatically back-in for a 20% working interest with regard to all existing and future wells and production therefrom," presumably decreasing the Plaintiffs' 25% working interest and the Williamses' 75% working interest proportionately.[48] Furthermore, the Exploration Agreement required working interest owners to contribute to SBM Energy, LLC "an additional $5,000 per month to cover other monthly operating expenses including electricity and insurance, in addition to general administrative services and supervision."[49]

---

[45] Exploration Agreement (Dkt. 29-1) Ex. C, ¶¶ 2(b), 3, at 3; *see also* Pls.' Mot. Summ. J. (Dkt. 29) ¶ 22, at 9 (asserting ownership of a working interest); Def. Stephen Merrill's Resp. (Dkt. 44) ¶¶ 22, 31, at 3–4 (admitting Plaintiffs' ownership of a working interest but explaining that Plaintiffs only owned a 75% interest in the leases, as provided in the Exploration Agreement).

[46] *See supra* note 45; Compl. (Dkt. 29-2) Ex. L, *supra* note 38, ¶ 25, at 20 (asserting that the Williamses "are working interest owners in some of these oil and gas schemes").

[47] Exploration Agreement (Dkt. 29-1) Ex. C, ¶¶ 3, 8, at 3, 5.

[48] *Id.* ¶ 10, at 6; Pls.' Mot. Summ. J. (Dkt. 29) ¶ 25, at 9; Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 25, at 4 ("Admitted.").

[49] *Id.* ¶ 12(c), at 6.

Despite Mr. Merrill's initial plans to use a separate company as operator of the wells on the leasehold interests,[50] SBM Energy, LLC ended up serving as the operator.[51] The parties have presented minimal evidence about oil production from the wells on the Kiowa County leases, the revenues received from sale of the oil, the operating expenses associated with the production, the investor's contributions toward those operating expenses, or the net profits realized by the investors. From December 2015 to September 2016, SBM Energy sold anywhere from 69.2 to 1,306.7 barrels of oil from the leases.[52] It appears the Plaintiffs and the Williamses were making contributions toward operating costs or "joint interest billing" during this period.[53] But the Williamses' contributions toward joint interest billing ceased sometime around September 2016, when they filed suit against Mr. Merrill, Mr. Schnell, SBM Energy, LLC, and SBM Operating, LLC in the U.S. District Court for the Northern District of Oklahoma for fraud, securities fraud, negligence, and conversion.[54] Because the Williamses were responsible for 75% of the joint interest billing, their lack of

---

[50] See Pls.' Mot. Summ. J. (Dkt. 29) ¶ 24, at 9; Exploration Agreement (Dkt. 29-1) Ex. C, ¶ 4, at 2 (discussing the plan to use SBM Operating LLC "for the purpose of conducting all the actual operations, thus providing a liability shield to SBM and Investors in the unlikely event of a catastrophic loss of any kind"); Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 24, at 3 (stating that SBM Operating LLC was formed but never used).

[51] Id. ¶ 27, at 9 (acknowledging that SBM Energy LLC was the operator); Tyson Aff. (Dkt. 29-3) Ex. X, ¶ 9, at 38.

[52] Total Barrels of Oil Sold by All Project Leases (Dkt. 29-2) Ex. T, at 43.

[53] See Cash Flow for Kiowa Project (Dkt. 29-2) Ex. R, at 36–38 (outlining the "JIB" for Plaintiffs); Loss on Stoppage of Production (Dkt. 29-2) Ex. S, at 41 (showing the "Joint Interest Billing" for all investors).

[54] See Pls.' Mot. Summ. J. (Dkt. 29) ¶¶ 27-28, at 9–10; Def. Stephen Merrill's Resp. (Dkt. 44) ¶¶ 27–28, at 4 (admitting ¶ 28 and only denying the allegations in ¶ 27 insofar as they suggest that Mr. Merrill may have a duty to prepare an operating agreement).

contributions led to a stoppage of production in December 2016 that would last until September 2017.[55] The Plaintiffs fault Mr. Merrill for the cessation, arguing that he should have prepared a joint operating agreement that would allow SBM Energy, LLC to garnish the payments going to the Williamses by the amount of joint interest billing they owe, but it appears none of the Plaintiffs ever asked for a Joint Operating Agreement.[56]

A year into the Williamses' lawsuit, the Williamses found a friend, Phil Osterhout of the Yarhola Production Co., who was interested in buying their working interests in the Kiowa County leases. On September 21, 2017, Mr. Osterhout met with the principals for Plaintiffs Bidarka Gas Corp., Duslei Energy, LLC, Jim Price Oil Co. LLC, and CCJ Ventures LLC—i.e., Jim Price and his son, Jimmy—to verify whether he wanted to be investment partners with the Plaintiffs.[57] Shortly thereafter, Mr. Osterhout agreed to buy out the Williamses, and the Williamses settled their lawsuit.[58] Mr. Osterhout's company became the operator on the leases.[59]

---

[55] *See* Pls.' Mot. Summ. J. (Dkt. 29) ¶¶ 27, 29, at 9–10; Def. Stephen Merrill's Resp. (Dkt. 44) ¶¶ 27, 29, at 4 (only denying the allegations in ¶¶ 27 and 29 insofar as they suggest that Mr. Merrill may have a duty to prepare an operating agreement).

[56] *See* Pls.' Mot. Summ. J. (Dkt. 29) ¶¶ 27, 29, at 9–10; Def. Stephen Merrill's Resp. (Dkt. 44) ¶¶ 27, 29, at 4.

[57] *See* James R. Price Aff. (Dkt. 29-4) Ex. BB, at 11–12; Def. Stephen Merrill's Proposed Findings of Fact & Conclusions of Law (Dkt. 67) ¶ 57, at 12.

[58] *See* James R. Price Aff. (Dkt. 29-4) Ex. BB, at 11; Def. Stephen Merrill's Proposed Findings of Fact & Conclusions of Law (Dkt. 67) ¶ 61, at 12.

[59] James R. Price Aff. (Dkt. 29-4) Ex. BB, at 12; Yarhola Prod. Co.'s 1/31/2018 Statement (Dkt. 29-4) Ex. BB, at 14–19; Yarhola Prod. Co.'s 1/31/2018 Jt. Interest Invoice (Ex. 29-4) Ex. BB, at 20–26.

At the September 21, 2017 meeting with Mr. Osterhout, Plaintiffs first became aware that Mr. Merrill had only paid Gary Tyson $525,000 for the Kiowa County leases, rather than $1,000,000.[60] Jim Price called Mr. Tyson to verify the information, and Mr. Tyson faxed him copies of the Exclusive Option Agreement and the two checks received from the MFS Trust.[61]

Shortly thereafter, on December 15, 2017, Plaintiffs filed this lawsuit against Mr. and Mrs. Merrill, SBM Energy, LLC, and the MFS Trust in the District Court of Oklahoma County, alleging that Mr. Merrill used SBM Energy, LLC and the MFS Trust to defraud them; to commit securities fraud in violation of §§ 12(1)–(2) and 17(a) of the Securities Act, § 10(b) of the Exchange Act and Rule 10b-5 thereunder, and certain provisions of the Oklahoma Securities Act, Okla. Stat. tit. 71, §§ 509 *et seq.*; to convert their investment money for his own use and benefit and seeking an accounting, the creation of a constructive trust over the assets Mr. Merrill acquired with their investment money, and an injunction preventing Mr. Merrill from dispersing such assets.[62] On January 16, 2018, Mr. Merrill removed the lawsuit to this Court.[63] On March 27, 2018, Plaintiffs filed an Amended Complaint (Dkt. 3) adding Mr. Schnell as a defendant.

---

[60] James R. Price Aff. (Dkt. 29-4) Ex. BB, at 12.

[61] *Id.*

[62] *Id.*; Pls.' Pet. (Dkt. 1-1) at 1, 7–14.

[63] Notice of Removal (Dkt. 1) at 1.

*Analysis*

Plaintiffs have filed a Motion for Summary Judgment (Dkt. 29), seeking summary adjudication against Defendants on several claims.

### A. Fraud

First, Plaintiffs seek summary adjudication against Mr. Merrill, SBM Energy, LLC, and the MFS Trust on the fraud claim and ask the Court to award them a money judgment in the amount of $112,500.00.

The elements of common law fraud are: (1) a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage.[64] Fraud is divided into actual fraud and constructive fraud.[65] Actual fraud requires the intentional misrepresentation or concealment of a material fact which substantially affects another person.[66] Constructive fraud is a breach of either a legal or equitable duty that does not necessarily involve any moral guilt, intent to

---

[64] *Bowman v. Presley*, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1218. There is some question as to whether Plaintiffs are asserting a common law fraud claim or a statutory fraud claim, particularly insofar as Plaintiffs' Motion for Summary Judgment cites both to case law concerning common law fraud and a state statute that defines the term "actual fraud." Upon review of the relevant statutory provisions, it appears such statutes would only apply if Plaintiffs were seeking to invalidate a contract. *See* Okla. Stat. tit. 15, §§ 51, 53, 57–59 (stating first that "[c]onsent of the parties to a contract must be: 1. Free. 2. Mutual; and, 3. Communicated by each to the other"; second that "consent is not real or free when obtained through: . . . 3. Fraud"; and third defining the terms "fraud," "actual fraud," and "constructive fraud" but only "within the meaning of this chapter"). As Plaintiffs are not seeking to invalidate the Exploration Agreement by which they obtained working interests in the Kiowa County leases, it appears their claim lies in the common law.

[65] *Patel v. OMH Med. Ctr., Inc.*, 1999 OK 33, ¶ 34, 987 P.2d 1185, 1199 (citations omitted).

[66] *Faulkenberry v. Kan. City S. Ry. Co.*, 1979 OK 142, ¶ 4, 602 P.2d 203, 206.

deceive, or actual dishonesty of purpose.[67] It may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage for the actor by misleading another to his prejudice.[68] Where a party has a duty to speak, but remains silent, there may be constructive fraud.[69] In *Deardorf v. Rosenbusch,* 1949 OK 117, 206 P.2d 996, the Oklahoma Supreme Court held:

> A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.

"Fraud is never presumed and each of its elements must be proved by clear and convincing evidence."[70]

Plaintiffs argue that Mr. Merrill committed actual fraud. They assert (1) Mr. Merrill's representations in July and August 2015 that he must pay Gary Tyson $1,000,000 to acquire the Kiowa County leases was a material misrepresentation; (2) that Mr. Merrill's failure to disclose that the MFS Trust had the right to purchase the leases for $550,000 pursuant to the Exclusive Option agreement that was executed in March 2015 constituted concealment of a material fact; (3) that Mr. Merrill's affirmative misrepresentation of a material fact and concealment of a material fact were knowing and intentional, as

---

[67] *Id.*

[68] *Patel*, 1999 OK 33, ¶ 34, 987 P.2d at 1199.

[69] *Evers v. FSF Overlake Assocs.*, 2003 OK 53, ¶ 16 n.3, 77 P.3d 581, 587 n.3 (citations omitted).

[70] *Bowman*, 2009 OK 48, ¶ 13, 212 P.3d at 1218.

demonstrated by the prior execution of the Exclusive Option agreement; (4) that Mr. Merrill intended for the Plaintiffs to act upon his fraudulent actions by giving him $1,000,000 in investment money; and (5) that Plaintiffs did rely upon his fraudulent actions by giving him $1,000,000 to their detriment. Plaintiffs further assert that Mr. Merrill "failed to disclose that he was retaining overrides on the Kiowa properties"—i.e., that he was assigning an overriding royalty interest of up to 25% to Russell Dozier and the SBM Energy, LLC management team. Plaintiffs claim their damages are $112,500, which is their 25% share of the difference between the $1,000,000 Plaintiffs gave Mr. Merrill and the $550,000 Mr. Merrill gave Mr. Tyson—i.e., 25% × ($1,000,000 − $550,000) = $112,500.

Mr. and Mrs. Merrill admit they only told Plaintiffs about the $1,000,000 price and that they never told Plaintiffs' about the $550,000 price, but argue such information is "irrelevant" because "[a]ll Plaintiffs and the Williamses were explicitly told that the cost to all of the investors was $1 million in order to purchase the Tyson Leasehold Interests" and "Defendants delivered as promised."[71] The Merrills justify the price mark-up by arguing that the MFS Trust deserved compensation for "gambling $25,000 of its own money to buy the Exclusive Option" when there was no guarantee that the penniless SBM Energy, LLC would be successful in raising the remaining balance of $525,000 needed to

---

[71] *E.g.*, Def. Stephen Merrill's Resp. (Dkt. 44) ¶ 17, at 3; *see also id.* at 6 ("Defendants told every Plaintiff, up front, that the cost to the investors would be one million dollars to buy the Tyson Leases. And the cost they actually paid, in fact, was exactly one million dollars, no more, no less. . . . [E]ach Defendant [sic] did, in fact, get exactly what they had agreed to.").

purchase the leasehold interests from Tyson.[72] Lastly, the Merrills point to ¶ 2(b) of the Exploration Agreement to demonstrate that they did advise Plaintiffs Mr. Merrill would be retaining an overriding royalty interest insofar as he advised Plaintiffs they would only be receiving 75% net revenue interest.

It is undisputed that Mr. Merrill knowingly concealed the facts that the MFS Trust possessed the exclusive option to purchase the leasehold interests, that Tyson was selling the leasehold interests for $550,000, and that the $450,000 mark-up would be split between himself and Mr. Schnell. It is also undisputed that he knowingly misrepresented that $1,000,000 were needed to purchase the leasehold interests from Mr. Tyson—even telling Bill Dozier and Jim Price that Mr. Tyson would not accept $600,000 or $700,000 and that they should refrain from contacting Mr. Tyson to negotiate the price down. The Merrills main argument seems to be an attack upon either the materiality of these facts or the existence of a detriment suffered. On one hand, they seem to be arguing that the only material information was an offer of leasehold interests in exchange for $1,000,000. On the other hand, they seem to suggest that Plaintiffs got exactly what they bargained for— i.e., the leasehold interests—at the price they bargained for, meaning they have suffered no harm. Under Oklahoma law, "[a] fact is material if a reasonably careful person under the circumstances would attach importance to it in determining [his/her] course of action."[73]

---

[72] *Id.* at 6; *see also id.* ¶ 10, at 2.

[73] Okla. Unif. Jury Instr.–Civ. 3d # 18.4 (rev. 2009); *accord* Restatement (Second) of Torts § 538, at 80 (stating that, for purposes of tort law, a "matter is material" in only two circumstances: (1) "[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction"; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter "in

Here, all of the facts that were either misrepresented or concealed would be important to Plaintiffs in determining whether they should hand over $1,000,000 or something less. Thus, those facts were material. Moreover, all the investors suffered a detriment to the tune of $450,000; the Plaintiff's portion is only 25% of that detriment, or $112,500.

Upon review of the undisputed facts and the parties' legal arguments, the Court finds that Mr. Merrill, in his capacity as President of SBM Energy, LLC, committed actual fraud. Although Plaintiffs seek judgment as a matter of law against Mr. Merrill in his individual capacity, SBM Energy, LLC, and the MFS Trust, the Court can only enter a summary adjudication on the common law fraud claim against SBM Energy, LLC. Plaintiffs have not presented any evidence to demonstrate why the corporate veil should be pierced to permit entry of judgment against Mr. Merrill, individually, nor have Plaintiffs presented any evidence to demonstrate why acts he took as an officer of the limited liability company should be attributed to the trust.

### B. Constructive Trust and Injunction

Plaintiffs' fourth claim concerns alternative equitable remedies for the fraud perpetrated by SBM Energy, LLC. In support of their request, Plaintiffs cite a statute that discusses constructive fraud but not constructive trusts, as well as two cases that do discuss constructive trusts but not in the context of summary judgment. Further, Plaintiffs do not

---

determining his choice of action," even though a reasonable person would not); Restatement (Second) of Contracts § 162(2) & cmt. C, at 439, 441 (1979) (stating that, for purposes of contract law, "a misrepresentation is material" only if it would "likely . . . induce a reasonable person to manifest his assent," or the defendant "knows that for some special reason [the representation] is likely to induce the particular recipient to manifest his assent" to the transaction).

attempt to identify any specific property that any of the Defendants have acquired with the fraudulently obtained funds, making it impossible for the Court to create a constructive trust over any specific property. Plaintiffs also have not discussed the elements for obtaining injunctive relief. Consequently, Plaintiffs are not entitled to the creation of a constructive trust or to the entry of an injunction at this summary judgment stage.

### C. Securities Fraud

Plaintiffs' second claim seeks summary adjudication against Mr. Merrill individually, Mr. Merrill in his capacity as trustee of the MFS Trust, and SBM Energy, LLC for alleged violations of § 12(2) of the Securities Act of 1933,[74] § 10(b) of the Securities Exchange Act of 1934,[75] and Rule 10b-5,[76] and again ask for an award of $112,500.00.[77]

The Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, governs dealings related to the initial issuance of securities. Section 2 of the Securities Act defines the term "security" to mean, among other things, "any . . . fractional undivided interest in oil, gas, or other mineral rights."[78] Section 11 governs the requirements for registered securities sold pursuant to registration statements filed with the SEC and allows purchasers of a registered security to

---

[74] 15 U.S.C. § 77ℓ (2012).

[75] *Id.* § 78j(b).

[76] 17 C.F.R. § 240.10b-5.

[77] Incidentally, despite the heading in Plaintiffs' Motion for Summary Judgment (Dkt. 29) that mentions "OKLAHOMA SECURITIES FRAUD," the motion never again mentions any state law concerning securities fraud.

[78] 15 U.S.C. § 77b(a)(1) (2012).

sue certain parties when false or misleading information is included in a registration statement.[79] Section 12 governs securities sold by a prospectus or oral communication and allows purchasers to sue certain parties when the prospectus or oral communication contains a misstatement or omission about which the party being sued did not know and could not have known after the exercise of reasonable care.[80]

In citing § 12(2), Plaintiffs imply that Tyson's oil and gas leasehold interests were being sold by means of a prospectus or oral communication. Otherwise, § 12(2) would not apply. But Plaintiffs fail to assert any undisputed facts to demonstrate that Tyson and the MFS Trust's Exclusive Option agreement, or even SBM Energy, LLC and Plaintiffs' Exploration Agreements were either a "prospectus" or "oral communication" such that the terms of § 12(2) are applicable. In the case of *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), the U.S. Supreme Court defined the term "prospectus" as "a document that describes *a public offering* of securities by an issuer or controlling shareholder" and that, "absent an overriding exemption [in § 3 of the Securities Act], must include 'the information contained in the registration statement'" as spelled out in §§ 7 and 10 of the Act.[81] The *Gustafson* Court also defined the phrase "oral communication" as being restricted to oral communications that relate to a prospectus.[82] Nothing in Plaintiffs' Motion for Summary Judgment (Dkt. 29) even attempts to demonstrate that the documents involved here were a

---

[79] *Id.* § 77k; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983).

[80] § 77ℓ(a)(2).

[81] 513 U.S. at 569, 571, 584 (emphasis added).

[82] *Id.* at 567–68.

prospectus, that they contained the same information that would appear in a registration statement filed with the SEC, or that some exemption under § 3 of the Act applies. Thus, it is not clear to this Court that § 12(2) of the Securities Act even gives rise to a claim under the undisputed facts presented by the parties. Also, Plaintiffs do not appear to be seeking the remedy offered by § 12(2), which would be a "recover[y] [of] the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon tender of such security, or for damages if he no longer owns the security."[83] Plaintiffs still own the alleged securities, but they are not seeking rescission of the purchase. Instead, Plaintiffs seek the difference between what they paid and what they would have paid had they known all of the material facts. Lastly, in light of the exclusive option to buy, it does not appear this transaction involved a "public offering" of securities. Plaintiffs are attempting to recycle their common law fraud claim under a theory of liability that does not apply. Consequently, Plaintiffs are not entitled to summary adjudication on the alleged violation of § 12(2) of the Securities Act of 1933.

But Plaintiffs also allege violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. The Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, governs dealings in securities following their initial issue. The Exchange Act is intended to protect the investing public from manipulation and deception and to promote free and fair public security markets and fair dealing in such markets.[84] Section 10(b) is a catch-all

---

[83] § 77ℓ(a).

[84] *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975); *see also Blackie v. Barrack*, 524 F.2d 891, 907

antifraud provision permitting a purchaser or seller "of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement" to bring an action against "any person" who has used "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."[85] Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" by the use, directly or indirectly, "of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange."[86] Federal jurisdiction depends on the "use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange."[87] The U.S. Supreme Court has previously implied a private cause of action from the text and purpose of § 10(b).[88] The elements of a claim for violation of § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by

---

(9th Cir. 1975) (stating that § 10(b) and Rule 10b-5 are designed to foster an expectation that securities markets are free from fraud, an expectation on which purchasers should be able to rely).

[85] § 78j(b); *see also Herman & Maclean*, 459 U.S. at 382.

[86] 17 C.F.R. § 240.10b-5; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

[87] § 78j; § 240.10b-5; *United States v. Kunzman*, 54 F.3d 1522, 1527 (10th Cir. 1995).

[88] *Matrixx Initiatives, Inc.*, 563 U.S. at 37 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007); *Herman & MacLean*, 459 U.S. at 380 & n.10 (citing *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 (1971); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976)).

the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[89]

Plaintiffs assert federal jurisdiction insofar as Mr. Merrill utilized bank accounts belonging to his law firm, the MFS Trust, and SBM Energy, LLC to orchestrate the alleged fraud. Plaintiffs also assert (1) the existence of material misrepresentations insofar as Mr. Merrill represented that SBM Energy, LLC would be purchasing the Kiowa County leases from Mr. Tyson for $1,000,000 and the existence of a material omissions insofar as Mr. Merrill failed to disclose that the MFS Trust was purchasing the securities for $550,000 and failed to disclose that he and others would receive an overriding royalty interest of up to 25% to; (2) that Mr. Merrill's affirmative misrepresentations of material facts and concealment of material facts were knowing and intentional, particularly insofar as he was a licensed attorney who should know better; (3) that the misrepresentations related to the price and the identity of the entity purchasing the securities, as well as the related omissions were clearly connected to the purchase of the securities; (4) that the Plaintiffs relied upon Mr. Merrill's misrepresentations and omissions when they gave him their 25% share of the $1,000,000; (5) that they suffered economic loss in the amount of $112,5000; and (6) that Mr. Merrill's misrepresentations and omissions were the cause of their loss.

---

[89] *Matrixx Initiatives, Inc.*, 563 U.S. at 37–38 (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

The Merrills again argue that the facts "that MFS was going to make a profit on the acquisition of the Tyson Leases and that Defendants were going to retain a small overriding interest in some, but not all, of the Tyson Leases . . . [are] not material fact[s]."[90]

Mr. Merrill's use of bank accounts appears to be a sufficient basis for establishing federal jurisdiction.[91] Moreover, it is undisputed that Mr. Merrill knowingly concealed the facts that the MFS Trust possessed the exclusive option to purchase the leasehold interests, that Tyson was selling the leasehold interests for $550,000, and that the $450,000 mark-up would be split between himself and Mr. Schnell. It is also undisputed that he knowingly misrepresented that $1,000,000 were needed to purchase the leasehold interests from Mr. Tyson—even telling Bill Dozier and Jim Price that Mr. Tyson would not accept $600,000 or $700,000 and that they should refrain from contacting Mr. Tyson to negotiate the price down. As discussed in relation to Plaintiffs' common law fraud claim, the facts withheld and the misrepresented facts were material facts related to the purchase or sale of the leasehold interests. All remaining elements are met, and the Merrills fail to dispute them.

Thus, upon review of the undisputed facts and the parties' legal arguments, the Court finds that judgment as a matter of law should be entered against Mr. Merrill in his capacity as trustee of the MFS Trust and SBM Energy, LLC on Plaintiffs' claim under

---

[90] *E.g.*, Def. Stephen Merrill's Resp. (Dkt. 44) at 7–8.

[91] *See Kunzman*, 54 F.3d at 1527 ("The evidence also included numerous checks drawn and deposited into banks involved in interstate commerce" such that "the district court had jurisdiction over the securities fraud counts." (citing *Reyos v. United States*, 431 F,2d 1337, 1348 (10th Cir. 1970), *aff'd in part, rev'd in part by Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972))).

§ 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Although Plaintiffs also seek judgment as a matter of law against Mr. Merrill in his individual capacity, the Court does not have sufficient evidence at this time to ascertain whether Mr. Merrill should be held liable. What is clear is that both Mr. Merrill in his capacity as trustee of the MFS Trust and in his capacity as President of SBM Energy, LLC participated in the deceptive contrivance that violated § 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

### D. Conversion

Next, Plaintiffs seek summary adjudication against Mr. Merrill individually, Mr. Merrill in his capacity as trustee of the MFS Trust, and SBM Energy, LLC for allegedly converting $112,500 of Plaintiffs' money.

Oklahoma law regarding the tort of conversion is well settled and the elements of liability are clear:

> Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. It is not necessary to constitute a conversion that the property come into the defendant's possession wrongfully. Nor is it necessary that the alleged converter apply the property to his own use, or be in bad faith.[92]

"In terms of essential elements, one seeking damages for conversion must plead and prove (a) he owns or has a right to possess the property in question, (b) that defendant wrongfully

---

[92] *Steenbergen v. First Fed. Sav. & Loan of Chickasha*, 1987 OK 122, ¶ 9, 753 P.2d 1330, 1332 (citing *Fed. Nat'l Bank of Shawnee v. Lindsey*, 1935 OK 455, 43 P.2d 1036; *U.S. Zinc Co. v. Colburn*, 1927 OK 76, 255 P. 688; *Stack v. Gudgel*, 158 P. 1144 (Okla. 1916); *White v. Webber-Workman Co.*, 1979 OK CIV APP 6, 591 P.2d 348).

interfered with such property right, and (c) the extent of his damages."[93] Where the undisputed facts establish all elements of conversion, summary judgment may properly be entered in Plaintiffs' favor.[94]

Under the undisputed facts shown by the summary judgment record in this case, Plaintiffs are not entitled to prevail on their conversion claim as a matter of law. Plaintiffs' claim fails because they voluntarily gave the entire $250,000 to SBM Energy, LLC; SBM Energy, LLC did not take it without Plaintiffs' consent. "[I]f the owner expressly or impliedly assents to or ratifies the taking, use, or disposition of his property, he cannot recover as for a conversion thereof."[95] Thus, Plaintiffs' motion for summary adjudication on the issue of conversion is denied.

### E. Negligence—Failure to Prepare Operating Agreement

Lastly, Plaintiffs seek summary judgment against the operator, SBM Energy, LLC, for alleged negligence resulting from its failure to prepare an operating agreement that would have permitted it to attach the funds being disbursed to the investors when they failed to pay their joint interest billings (i.e., operating expenses). Plaintiffs allege the absence of an operating agreement permitted Buford and Helen Williams to essentially

---

[93] *White*, 1979 OK CIV APP 6, ¶ 4, 591 P.2d at 350, *cited in Steenbergen*, 1987 OK 122, 753 P.2d 1330; *accord* Okla. Unif. Jury Instr.–Civ. 3d # 27-1 (rev. 2009).

[94] *See*, *e.g.*, *Steenbergen*, 1987 OK 122, ¶ 12, 753 P.2d at 1333.

[95] Rose Bros., Inc. v. City of Alva, 1960 OK 231, ¶14, 356 P.2d 1083, 1085 (citing *Okla. Farmer's Nat'l Grain Corp. v. Kirkendall*, 1938 OK 337, 79 P.2d 570); *accord Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 2016 OK 55, ¶ 12, 374 P.3d 820, 825 ("Conversion of personal property does not require the property be obtained by wrongful means, but it must be either obtained or appropriated without the owner's consent.").

shut down operations when they decided to stop paying their joint interest billings, and neither SBM Energy, LLC nor Plaintiffs could do anything about it. Plaintiffs assert this resulted in lost revenue equaling $17,588, although Plaintiffs failed to assert that specific amount of damages as an undisputed fact.

Plaintiffs' motion fails to cite any case supporting the existence of an operator's duty to prepare a joint operating agreement, nor has the Court found any, even after looking for cases that might incorporate that notion into an operator's duty of diligent and proper operation.[96]

Consequently, Plaintiffs' motion for summary adjudication on the issue of negligence is denied.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt. 29) is hereby **GRANTED IN PART** and **DENIED IN PART**. This case remains set for trial on Tuesday, February 18, 2020.

**IT IS SO ORDERED this 15th day of February, 2020.**

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[96] For a discussion of the duty of diligent and proper operation, see, e.g., 5 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 59.1, at 105 (1991).